## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ROGER L. SUDLER, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C.A. No. 15-729-LPS |
| | : | |
| NANCY A. BERRYHILL, Acting | : | |
| Commissioner of Social Security, | : | |
| | : | |
| Defendant.[1] | : | |

Angela Pinto Ross, DOROSHOW, PASQUALE, KRAWITZ & BHAYA, Wilmington, DE

    Attorney for Plaintiff.

David C. Weiss, Acting United States Attorney, and Heather Benderson, Special Assistant United States Attorney, United States Attorney's Office, Wilmington, DE

Nora Koch and Robert S. Drum, Office of the General Counsel, Social Security Administration, Philadelphia, PA

    Attorneys for Defendant.

## MEMORANDUM OPINION

March 30, 2017
Wilmington, Delaware

---

[1]Nancy A. Berryhill is now the Acting Commissioner of Social Security. Pursuant to Federal Rule of Civil Procedure 25(d), Nancy A. Berryhill is substituted for former Commissioner Carolyn W. Colvin.

*Leul P. Ars*

**STARK, U.S. District Judge:**

## I. INTRODUCTION

Plaintiff Roger L. Sudler appeals a final decision of the Acting Commissioner of Social Security, Nancy A. Berryhill ("Commissioner" or "Defendant"), denying Plaintiff's application for disability insurance benefits and supplemental security income, under Title II, 42 U.S.C. §§ 401-434, and Title XVI, 42 U.S.C. §§ 1381-1383, of the Social Security Act. The Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c)(3).

Pending before the Court are cross-motions for summary judgment filed by Sudler and the Commissioner. (*See* D.I. 10, 14) Sudler requests that the Court remand to the ALJ for further proceedings. (*See* D.I. 11 at 20-21) The Commissioner requests that the Court affirm the decision denying Plaintiff's application for benefits. (*See* D.I. 15 at 16) For the reasons set forth below, the Court will grant in part and deny in part the motions for summary judgment and remand for further proceedings.

## II. BACKGROUND

### A. Procedural History

On April 18, 2012, Sudler protectively filed an application for supplemental security income benefits, alleging disability with an onset date of April 1, 2012, due to HIV, bipolar disorder, depression, mood disorder, and chronic asthma. (*See* D.I. 7 at 287-297 ("Tr.")) Sudler also filed an application for disability insurance benefits on May 2, 2012. (*See id.*) The claims were initially denied on August 8, 2012, and again upon reconsideration on April 19, 2013. (*See id.* at 28) After a hearing before an Administrative Law Judge ("ALJ") on July 17, 2014, the ALJ issued a decision on October 1, 2014, finding that Plaintiff did not have a disability within the

1

meaning of the Social Security Act. (*See id.* at 28-44) Plaintiff filed a request for review of the ALJ's decision, which was denied on June 25, 2015, resulting in a final decision of the Commissioner of Social Security. (*See id.* at 1)

On August 24, 2015, Sudler filed a complaint in the District of Delaware, seeking judicial review of the ALJ's decision. (*See* D.I. 2) Sudler moved for summary judgment on April 8, 2016 (*see* D.I. 10), and the Commissioner filed a cross-motion for summary judgment on June 9, 2016 (*see* D.I. 14).

## B. Factual Background

### 1. Plaintiff's testimony

Sudler was born on May 26, 1978, and lives in Dover, Delaware. (*See* Tr. at 55-56) Plaintiff has a high school diploma and enrolled in some college courses at Delaware State University, although he never received any degrees or certificates. (*See id.* at 57) Sudler has past work experience as a card services manager, a group home caretaker, a cashier, and a certified nurse's assistant. (*See id.* at 71-73) Plaintiff also received on-the-job training as a mechanic. (*See id.* at 59) Plaintiff testified that in 2007, he was convicted in Delaware of identity theft for making a purchase at a Target with a stolen credit card. (*See id.* at 59-60) Plaintiff is also a father and sees his daughter about every other weekend. (*See id.* at 56)

Plaintiff stopped working in April 2012, after leaving his full-time employment as a mechanic at a flame retardant file cabinet manufacturer, where he had worked for three years. (*See id.* at 58-59, 74-75) Plaintiff testified to having had a "meltdown" in 2012, which resulted in frustration, lowered attendance, and difficulty handling his job duties. (*Id.*) Plaintiff testified that he took time off, began counseling at Kent Wellness Clinic, and – at the advice of his

2

therapist – stopped working altogether. (*See id.* at 59)

Plaintiff testified that he had no physical limitations until about three months before the hearing and continued to drive. (*See id.* at 63) Plaintiff testified that his medications make him feel sedated, and that he stays in bed most of the time. (*See id.* at 64) Plaintiff stated that he tried to go to places like the library, the gym, or the mall but that he felt too lethargic to go and stopped trying. (*See id.* at 64-65)

## 2. Plaintiff's Medical History

### a. Voluntary Hospitalizations

Plaintiff voluntarily submitted to hospitalization for psychiatric reasons four times between April 2012 and May 2013. (*See id.* at 32) Sudler was first hospitalized for about a week in April 2012 for depression and suicidal thoughts. (*See id.* at 394-95) During that stay, he was diagnosed with major depressive disorder, and his symptoms improved, in part due to being prescribed medications to treat that disorder. (*See id.*) Sudler was hospitalized again, for nearly two weeks, in August 2012, for depression and suicidal ideation, and again saw some improvement. Sudler was diagnosed with bipolar I disorder and depression, and prescribed three different medications. (*See id.* at 761-65) Plaintiff's third hospitalization, again the result of depression and suicidal thoughts, lasted one week in March 2013. (*See id.* at 535) During his stay, Plaintiff was prescribed a number of medications to treat his mental-health disorders. (*See id.* at 538) Finally, Sudler was hospitalized for a week in May 2013 after running out of his medications. (*See id.* at 772) Sudler again showed improvement during the course of his stay, during which his medications were adjusted and he was referred to out-patient treatment. (*See id.* at 775) Sudler does not report any hospital stays after May 2013.

3

### b.      Out-patient Treatment

Sudler was seen by multiple doctors and therapists starting around April 2012. (*See id.* at 35-39) Of most importance here are Sudler's ongoing treatments with therapist Henriette Morris and psychiatrist Berjees Mukhtar. Following his August 2012 hospitalization, Sudler was referred for out-patient therapy to Ms. Morris, a licensed clinical social worker. (*See id.* at 620-21) Ms. Morris' progress notes indicate that Plaintiff suffered from bipolar I disorder and insomnia. (*See, e.g., id.* at 466, 476) Her notes suggest that Plaintiff improved on medication and that his attention and concentration were intact despite the effects of depression and anxiety. (*See, e.g., id.* at 478, 500) For example, on May 23, 2013, Ms. Morris indicated that Sudler was "feeling much better" on medication, but was sometimes experiencing periods of hypersomnia. (*Id.* at 570) She also noted that Sudler's medications "can be sedative" as a side effect. (*Id.*)

After his May 2013 hospital stay, Plaintiff also began to see Dr. Mukhtar, who noted that Plaintiff has bipolar disorder. (*See id.* at 737-39) On several occasions, Dr. Mukhtar's notes indicate that Plaintiff reported prolonged periods of sleeping or sleep disturbances. (*See, e.g., id.* at 709, 730, 734) In February 2014, Dr. Mukhtar recommended that Plaintiff undergo electroconvulsive therapy, as Dr. Mukhtar thought Sudler showed signs of medication resistance. (*See id.* at 695) Dr. Mukhtar's notes from June 2014 indicate that Sudler had not been cleared for electroconvulsive therapy for cardiac reasons. (*See id.* at 689)

### c.      Cardiology Testing

As a result of Dr. Mukhtar's referral for electroconvulsive therapy, Sudler underwent a cardiac exam. Plaintiff's cardiologist, Dr. Horjinder Grewal, performed a echocardiogram on May 19, 2014, which showed severely reduced systolic function with an ejection fraction of 30%,

4

a reversed E/A ratio, and severe global hypokinesis of the left ventricle. (*See id.* at 748) Dr. Grewal then performed additional testing – left and right heart catheterizations, selective coronary angiography, left ventriculography, and right lower leg angiography – on June 13, 2014, which also showed "severely reduced left ventricular systolic function with an ejection of 30 percent." (*Id.* at 744-45) At the hearing before the ALJ, Sudler's counsel stated that additional follow-up was needed on these tests. (*See id.* at 54)

### 3.    Medical Opinion Evidence

Plaintiff submitted two opinions from treating providers: cardiologist Dr. Grewal and therapist Ms. Morris. (*See id.* at 541, 740-43) Sudler was also assessed by several non-treating medical and psychiatric consultants. (*See id.* at 39-41)

### a.    Treating Providers' Opinions

In a letter dated November 8, 2013, Ms. Morris wrote that she had been working with Plaintiff since May of 2012 for bipolar I disorder with episodic depression, anxiety, and trauma. (*See id.* at 541) Ms. Morris stated that Plaintiff incurred four hospitalizations, each lasting at least two weeks, and she described his current mental health as "very unpredictable." (*Id.*) She opined that "active gainful employment with stringent attendance requirement[s] as well as increased stress may prove to be counterproductive in his strive for symptomatic control." (*Id.*)

In a physical residual functional capacity questionnaire filled out on July 7, 2014, Dr. Grewal identified Sudler as having idiopathic cardiomyopathy causing fatigue with impairment lasting or expected to last in excess of 12 months. (*See id.* at 740) Dr. Grewal stated that Plaintiff needs a life vest and beta blockers and that Plaintiff's depression contributes to his condition. (*See id.*) Dr. Grewal did not estimate Sudler's functional limitations but stated that

5

Plaintiff is "disabled." (*See id.* at 741-42) Dr. Grewal concluded that Sudler is incapable of performing even low-stress work and that he would be absent "everyday." (*Id.* at 741, 743)

### b.   Consultations with Non-Treating Physicians

Sudler underwent a number of consultative evaluations, including by Drs. Ephraim Ayoola and Joseph Keyes in July 2012. (*See id.* at 421-33) Following a physical examination, Dr. Ayoola found Plaintiff had a normal gait, normal dexterity, normal grip, and normal motor power and strength. (*See id.* at 424) A heart examination found no gallops or murmurs, no heave or thrill, and detected first and second heart sounds. (*See id.* at 423) Dr. Ayoola concluded that Plaintiff had the ability to sit or stand 3 to 4 hours at a time during a normal 8-hour workday and can lift and carry 25 pounds. (*See id.* at 424)

Dr. Keyes performed a clinical psychological evaluation of Sudler. (*See id.* at 429) Dr. Keyes found mild attention disturbance but a normal mental alertness with clear and organized thinking. (*See id.* at 430-31) Dr. Keyes diagnosed Sudler with major depressive disorder. (*See id.* at 432) Dr. Keyes noted mild limitations in the ability to relate to others on a daily basis and restriction of daily activities, no limitation in understanding or carrying out simple instructions, and moderate limitations in coping with work pressures and sustaining performance and attendance in a normal work setting. (*See id.* at 434-35)

Plaintiff received additional assessments from Drs. Francis Murphy, David Hutz, Darrin Campo, and Christopher King between July 2012 and April 2013. (*See id.* at 40) These doctors consistently concluded that Sudler has no more than moderate work restrictions due to his impairments. (*See id.*) All of the non-treating physicians evaluated Sudler before he was diagnosed with a heart condition. (*See id.* at 39-41)

6

**4.     The ALJ's Findings**

The ALJ made the following findings in his October 1, 2014 decision:

1.      The claimant meets the insured status requirements of the Social
Security Act through December 31, 2015.

2.      The claimant has not engaged in substantial gainful activity since
April 1, 2012, the alleged onset date (20 CFR 404.1571 *et seq*., and
416.971 *et seq.*)

3.      The claimant has the following severe impairments: major
depressive disorder; depression; status HIV positive; bipolar
disorder; anxiety disorder; impulse control disorder; cluster C
personality disorder traits; obesity; a heart disorder; and renal
inefficiency (20 CFR 404.1520(c) and 416.920(c)).

4.      The claimant does not have an impairment or combination of
impairments that meets or medically equals the severity of one of
the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1
(20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925,
and 416.926).

5.      After careful consideration of the entire record, [the ALJ] find[s]
that the claimant has the residual functional capacity to perform
sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a)
except the work must be unskilled, with a reasoning level of 1 or 2;
no interaction with the general public; no more than occasional
postural activity; no more than occasional pushing or pulling with
the bilateral lower extremities and the bilateral upper extremities;
no more than occasional overhead reaching with the bilateral upper
extremities; no more than occasional exposure to atmospheric
irritants, such as dust, fumes, odors, gases; no exposure to
temperature extremes, wetness, or high humidity; and no exposure
to more than a "moderate" noise intensity level as described in the
Selected Characteristics of Occupations.

6.      The claimant is unable to perform any past relevant work (20 CFR
404.1565 and 416.965).

7.      The claimant was born on May 26, 1978 and was 33 years old,
which is defined as a younger individual age 18-44, on the alleged
disability onset date (20 CFR 404.1563 and 416.963).

8.     The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (*See* SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from April 1, 2012, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. at 28-44) In making these findings, the ALJ afforded little weight to the opinions of Dr. Grewal and Ms. Morris. (*See id.* at 39, 41) With respect to non-treating sources, the ALJ awarded significant weight to the opinions of Drs. Keyes, Murphy, and King (*see id.* at 40) and only limited weight to the opinions of Drs. Campo, Hutz, and Ayoola, as the latter physicians' assessments of Sudler's physical abilities did not reflect his recently diagnosed heart condition (*see id.* at 40-41). The ALJ also did not find Sudler's testimony on the intensity, persistence, and limiting effects of his impairments to be entirely credible. (*See id.* at 34)

## III.   LEGAL STANDARDS

### A.   Motion for Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 415 U.S. 574, 586

n.10 (1986). A party asserting that a fact cannot be – or, alternatively, is – genuinely disputed must support its assertion either by citing to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motions only), admissions, interrogatory answers, or other materials," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) & (B). If the moving party has carried its burden, the nonmovant must then "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita,* 415 U.S. at 587 (internal quotation marks omitted). The Court will "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

To defeat a motion for summary judgment, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586–87; *see also Podohnik v. U.S. Postal Service,* 409 F.3d 584, 594 (3d Cir. 2005) (stating that party opposing summary judgment "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue") (internal quotation marks omitted). However, the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment;" a factual dispute is genuine only where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 411 U.S. 242, 247-48 (1986). "If the evidence is merely colorable, or is not significantly probative, summary

9

judgment may be granted." *Id.* at 249-50 (internal citations omitted); *see also Celotex Corp. v. Catrett,* 411 U.S. 317, 322 (1986) (stating entry of summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party"s case, and on which that party will bear the burden of proof at trial").

## B.    Review of the ALJ's Findings

The Court must uphold the Commissioner's factual decisions if they are supported by "substantial evidence." *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *see also Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986). "Substantial evidence" means less than a preponderance of the evidence but more than a mere scintilla of evidence. *See Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005). Substantial evidence "does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).

In determining whether substantial evidence supports the Commissioner's findings, the Court may not undertake a *de novo* review of the Commissioner's decision and may not re-weigh the evidence of record. *See Monsour*, 806 F.2d at 1190-91. The Court's review is limited to the evidence that was actually presented to the ALJ. *See Matthews v. Apfel*, 239 F.3d 589, 593-95 (3d Cir. 2001). However, evidence that was not submitted to the ALJ can be considered by the Appeals Council or the District Court as a basis for remanding the matter to the Commissioner for further proceedings, pursuant to the sixth sentence of 42 U.S.C. § 405(g). *See Matthews*, 239 F.3d at 592. "Credibility determinations are the province of the ALJ and only should be disturbed on review if not supported by substantial evidence." *Gonzalez v. Astrue*, 537 F. Supp. 2d 644, 657 (D. Del. 2008) (internal quotation marks omitted).

The Third Circuit has explained that a "single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence, particularly certain types of evidence (e.g., that offered by treating physicians) – or if it really constitutes not evidence but mere conclusion." *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983). Thus, the inquiry is not whether the Court would have made the same determination but, rather, whether the Commissioner's conclusion was reasonable. *See Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1983). Even if the reviewing Court would have decided the case differently, it must give deference to the ALJ and affirm the Commissioner's decision if it is supported by substantial evidence. *See Monsour*, 806 F.2d at 1190-91.

## IV.    DISCUSSION

### A.    Disability Determination Process

Title II of the Social Security Act, 42 U.S.C. § 423(a)(1)(D), "provides for the payment of insurance benefits to persons who have contributed to the program and who suffer from a physical or mental disability." *Bowen v. Yuckert,* 482 U.S. 137, 140 (1987). Title XVI of the Social Security Act provides for the payment of disability benefits to indigent persons under the SSI program. *See* 42 U.S.C. § 1382(a). A "disability" is defined for purposes of SSI and DIB as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *See* 42 U.S.C. § 1382c(a)(3). A claimant is disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot,

11

considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(l)(B); *see also Barnhart v. Thomas*, 540 U.S. 20, 21-23 (2003).

In determining whether a person is disabled, the Commissioner is required to perform a five-step sequential analysis. *See* 20 CFR § 416.920; *see also Russo v. Astrue*, 421 F. App'x 184, 188 (3d Cir. Mar. 21, 2011). If a finding of disability or non-disability can be made at any point in the sequential process, the Commissioner will not review the claim further. *See* 20 C.F.R. § 416.920(a)(4).

At step one, the Commissioner must determine whether the claimant is engaged in any substantial gainful activity. *See* 20 C.F.R. § 416.920(a)(4)(i) (mandating finding of non-disability when claimant is engaged in substantial gainful activity). If the claimant is not engaged in substantial gainful activity, step two requires the Commissioner to determine whether the claimant is suffering from a severe impairment or a combination of impairments that is severe. *See* 20 CFR § 416.920(a)(4)(ii) (mandating finding of non-disability when claimant's impairments are not severe). If the claimant's impairments are severe, the Commissioner, at step three, compares the claimant's impairments to a list of impairments that are presumed severe enough to preclude any gainful work. *See* 20 C.F.R. § 416.920(a)(4)(iii). When a claimant's impairment or its equivalent matches an impairment in the listing, the claimant is presumed disabled. *See id.* If a claimant's impairment, either singly or in combination, fails to meet or medically equal any listing, the analysis continues to steps four and five. *See* 20 C.F.R. § 416.920(e).

At step four, the Commissioner determines whether the claimant retains the residual

12

functional capacity to perform her past relevant work. *See* 20 C.F.R. § 416.920(a)(4)(iv) (stating claimant is not disabled if able to return to past relevant work). A claimant's residual functional capacity is "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." *Fargnoli v. Massanari*, 247 F.3d 34, 40 (3d Cir. 2001). "The claimant bears the burden of demonstrating an inability to return to her past relevant work." *Plummer v. Apfel*, 186 F.3d 422, 428 (3d Cir. 1999) (internal citation omitted).

If the claimant is unable to return to her past relevant work, step five requires the Commissioner to determine whether the claimant's impairments preclude her from adjusting to any other available work. *See* 20 C.F.R. § 416.920(a)(4)(v) (mandating finding of non-disability when claimant can adjust to other work); *see also Plummer*, 186 F.3d at 428. At this last step, the burden is on the Commissioner to show that the claimant is capable of performing other available work before denying disability benefits. *See id.* In other words, the Commissioner must prove that "there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with [her] medical impairments, age, education, past work experience, and residual functional capacity." *Id.* In making this determination, the ALJ must analyze the cumulative effect of all of the claimant's impairments. *See id.* At this step, the ALJ often seeks the assistance of a vocational expert. *See id.*

**B.      The Issues Raised on Appeal**

Sudler contends that the ALJ (1) failed to adequately consider evidence of drowsiness, fatigue, and hypersomnia; (2) failed to accord adequate weight to the opinions of Plaintiff's treating cardiologist and therapist; and (3) failed to obtain a medical expert opinion when assessing Plaintiff's cardiomyopathy.

13

### 1.    The ALJ Adequately Considered Evidence
of Drowsiness, Fatigue, and Hypersomnia

Sudler first argues that the ALJ failed to fully consider his symptoms of fatigue,

drowsiness, and hypersomnia. (*See* D.I. 11 at 11)  Specifically, Sudler contends that the ALJ

failed to consider these as symptoms of depression and cardiomyopathy, as opposed to merely

side effects of medications. (*See id.* at 12-13)

When evaluating subjective symptoms like fatigue, regulations require (1) objective

evidence of a medically determinable impairment that could reasonably be expected to produce

the symptoms alleged, followed by (2) an evaluation of the intensity and persistence of the pain

or symptoms and the extent to which it affects the individual's ability to work. *See* 20 C.F.R.

§§ 404.1529, 416.929.

On the first point, the ALJ detailed Sudler's impairments and symptoms, including his

testimony "that he spends most of his time in bed," is "too tired and lethargic to engage in prior

activities," and suffers from "constant fatigue" and "sleep disturbance." (Tr. at 34)  The ALJ

then determined that Sudler's medically-determinable impairments – "HIV/AIDS, a heart

condition, bipolar disorder, depression, and a mood disorder" – could reasonably be expected to

cause the alleged symptoms. (*Id.*)  The ALJ also recognized that fatigue is a physical side effect

of Sudler's medications. (*See id.* at 35)  Accordingly, the ALJ considered fatigue to be both a

result of Sudler's impairments and a side effect of his medications.  That the ALJ did not analyze

fatigue caused by depression or heart disease separately from fatigue caused by medications does

not suggest that the ALJ did not fully consider Sudler's fatigue symptoms.

The ALJ then explained his finding that Sudler's statements concerning the intensity,

14

persistence, and limiting effects of his symptoms were not entirely credible. (*See id.* at 34) An ALJ's credibility determinations are generally entitled to great deference, *see Gonzalez,* 537 F. Supp. 2d at 665, and the Court sees no reason to disturb the ALJ's findings here. The ALJ, considering the record as a whole, and having observed Sudler testify, found that Sudler demonstrates no more than moderate limitations from fatigue. (*See* Tr. at 32) Substantial evidence supports this finding. The ALJ described Sudler's treatment records, and found that they focus primarily on his mental issues and medication side effects, such as fatigue. (*See id.* at 35) Specifically, the ALJ discussed medical records from numerous doctors, which included Sudler's reports of ongoing sleeping problems. (*See id.* at 37-38) The ALJ, however, found that these medical records suggest that Sudler is only moderately limited. (*See id.* at 32) For example, Ms. Morris' notes indicate that, despite reports of sleeping issues, Sudler had intact memory, attention, and concentration. (*See, e.g., id.* at 500) The ALJ described Ms. Morris' notes from 2013, which reported that Sudler had improved sleep, was exercising, and had taken a trip to Philadelphia. (*See id.* at 37, citing *id.* at 469, 609) The ALJ also cited records from Drs. Mukhtar, King, and Keyes, who each noted that the Plaintiff appeared to be self-sufficient and independent in his personal life. (*See id.* at 37-39) Further, the ALJ discussed Sudler's testimony that he continues to drive a car, which demonstrates "concentration and persistence." (*Id.* at 42)

Regardless of the alleged source of fatigue,[2] the ALJ fully considered Sudler's reported symptoms of fatigue and sleep issues, and adequately explained why the evidence supports his

---

[2]Notably, Sudler testified that his medications caused the drowsiness and fatigue. (*See* Tr. at 64-66, 76)

15

findings. The ALJ determined that the medical assessments are consistent with one another and show that Sudler has no more than moderate limitations. In limiting Sudler's residual functional capacity to unskilled work with a maximum reasoning level of 1 or 2, the ALJ accounted for these symptoms.

Accordingly, the Court finds no reversible error with respect to Plaintiff's first issue on appeal.

### 2.    The ALJ Did Not Err in Weighing Opinions of Treating Providers

Sudler next argues that the ALJ erred in discounting opinions from treating providers Dr. Grewal and Ms. Morris. (*See* D.I. 11 at 14-18)

The Third Circuit subscribes to the "treating physician doctrine." *See Mason v. Shalala*, 994 F.2d 1058, 1067 (3d Cir. 1993). According to this rule, a treating physician's opinion is accorded "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and it is not inconsistent with the other substantial evidence in the record." *Fargnoli*, 247 F.3d at 43. "A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." *Plummer*, 186 F.3d at 429 (internal citation omitted).

When there is medical evidence contradicting the treating physician's view, the ALJ must carefully evaluate how much weight to accord the treating physician. *See Gonzalez*, 537 F. Supp. 2d at 660; *Barnhill v. Astrue*, 794 F. Supp. 2d 503, 515 (D. Del. 2011). If a treating physician's opinion is not given controlling weight, the ALJ should consider numerous factors in

16

determining the weight to give it, including: the length, nature, and extent of the treatment relationship; the frequency of examination; the amount of medical evidence offered in support of the opinion; the consistency of the opinion with the record as a whole; and the specialization of the treating physician. *See* 20 C.F.R. §§ 416.1527(c)(2)-(6); *see also* Social Security Rule 96-2p, 1996 WL 374188, at *5.

In reviewing the ALJ's analysis, it is not for the Court to re-weigh the medical opinions in the record. *See Gonzalez*, 537 F. Supp. 2d at 659. Rather, the Court must determine whether substantial evidence exists to support the ALJ's weighing of those opinions. *See id.*

### a.   Substantial Evidence Supports the ALJ's Weighing of Ms. Morris' Opinion

The ALJ afforded less weight to the opinion of Sudler's therapist, Ms. Morris, than to the assessments of Dr. Mukhtar, a treating psychiatrist. (*See* Tr. at 39) Substantial evidence supports the ALJ's weighing of Ms. Morris' opinion.

As a preliminary matter, the ALJ concluded that Ms. Morris, as a licensed clinical social worker, did not provide "the opinion of an acceptable medical source," and therefore her opinion does not come within the purview of the treating physician doctrine. (*Id.* at 39) Generally, the treating physician doctrine includes "physicians and psychologists or other acceptable medical sources." 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2). The applicable regulations do not list a social worker as an acceptable medical source. *See* 20 C.F.R. § 404.1513(a), 416.913(a) (listing acceptable medical sources); *see also Emery v. Colvin*, 2015 WL 4770551, at *3 (E.D. Pa. Aug. 11, 2015).

Furthermore, the ALJ found inconsistencies between Ms. Morris' opinion, on the one

17

hand, and her previously-recorded observations of Sudler and other evidence in the record, on the other hand. (*See* Tr. at 39) Specifically, Ms. Morris' opinion stated that each of Sudler's four hospitalizations exceeded two weeks, but his hospitalization records show only one in-patient stay approaching two weeks, with the other three being one week or less. (*See id.* at 541) Additionally, Ms. Morris opined that Plaintiff's mental status is "very unpredictable" and any employment would prove counterproductive for his treatment. (*See id.*) Yet the ALJ pointed to prior medical assessments by Ms. Morris where she stated that Plaintiff was "sleeping better, exercising, spending time with his daughter, and trying to get into a vocational rehabilitation program," and overall was exhibiting an improved mood with better sleeping habits. (*See id.* at 37-38) The ALJ also found Dr. Mukhtar's medical assessments to be consistent with Ms. Morris' notes, further supporting that Ms. Morris' opinion is inconsistent with substantial evidence of record. (*See id.* at 39)

Sudler also contends that the ALJ impermissibly relied on Global Assessment of Functioning ("GAF") scores to discount Ms. Morris' opinion. Although the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders no longer uses GAF scores (*see id.* at 36 n.1), the Social Security Administration allows GAF scores to be used as opinion evidence. *See Siple v. Colvin*, 2017 WL 58955, at *7 (D. Del. Jan. 5, 2017). The Court finds no error in the ALJ's use of GAF scores as further evidence of inconsistencies between Ms. Morris' opinion and the record.

Accordingly, the ALJ did not err in awarding little weight to Ms. Morris' opinion.

18

### b. Substantial Evidence Supports the ALJ's Weighing of Dr. Grewal's Opinion

Substantial evidence also supports the ALJ's decision to give little weight to Dr. Grewal's opinion. Dr. Grewal's opinion consists of a questionnaire, identifying that Sudler has idiopathic cardiomyopathy. (*See* Tr. at 740-43)

The ALJ found that Dr. Grewal's opinion, despite being that of a treating physician, was neither well-supported by medically-acceptable evidence nor consistent with substantial evidence of record. (*See id.* at 41) In particular, the ALJ noted that Dr. Grewal's diagnosis did not occur until mid-2014, shortly before the date of the hearing. The ALJ indicated that the diagnosis was very recent, with Sudler continuing to undergo testing to determine the extent and nature of his heart condition. (*See id.*; *see also id.* at 54-55) Thus, the ALJ found that Dr. Grewal's opinion about the extent and duration of Sudler's impairments and symptoms resulting from the heart condition was not yet well supported by medically-acceptable evidence, given that the condition had yet to be fully diagnosed.

The Court finds no error in the ALJ's analysis. While Dr. Grewal had performed some testing on Sudler, he offered very little explanation for his opinion and no explanation for why Sudler's initial test results indicate that his impairments can be expected to last at least 12 months. (*See* Tr. at 740) An ALJ is permitted – as he did here – to give less weight to a conclusory opinion of a treating physician. *See Prokopick v. Comm'r of Soc. Sec.*, 272 F. App'x 196, 199 (3d Cir. 2008); *Mason*, 994 F.2d at 1065; *Jones v. Sullivan*, 954 F.2d 125, 129 (3d Cir. 1991). Therefore, although there is no contrary evidence in the record about the likely duration of Sudler's heart condition, the ALJ did not err in discounting Dr. Grewal's opinion on the

19

matter. *See Plummer*, 186 F.3d at 429 ("An ALJ may reject a treating physician's opinion outright only on the basis of contradictory medical evidence, but may afford a treating physician's opinion more or less weight depending upon the extent to which supporting explanations are provided.").

The ALJ also found inconsistencies between Dr. Grewal's opinion and other substantial evidence in the record. Dr. Grewal's opinion did not assess Sudler's functional limitations, such as sitting, standing, or exertional abilities, but simply concluded that Sudler is disabled due to his heart condition. (*See* Tr. at 41, describing *id.* at 740-43) The ALJ found this conclusion inconsistent with the physical abilities evinced by Sudler's testimony, such as living independently, caring for his daughter on weekends, and driving a car. (*See id.* at 41) Thus, while not discounting Sudler's diagnosis of a heart condition, the ALJ gave little weight to Dr. Grewal's opinion, in light of the incomplete diagnosis as well as record evidence suggesting that Sudler retains greater functionality than identified by Dr. Grewal.

Accordingly, the Court finds no error in the ALJ's assigning little weight to Dr. Grewal's opinion.

### 3.    Additional Evidence on Sudler's Heart Condition is Needed

Finally, Sudler contends that the ALJ erred in failing to seek a Commission-designated medical expert opinion on his heart condition before finding that the condition does not meet the severity requirements of cardiomyopathy under listing 4.02.

"ALJs have a duty to develop a full and fair record in social security cases. Accordingly, an ALJ must secure relevant information regarding a claimant's entitlement to social security benefits." *Ventura v. Shalala*, 55 F.3d 900, 902 (3d Cir. 1995) (internal citations omitted). This

is so even though the claimant bears the burden to prove his disability. *See Hess v. Sec'y of Health, Ed. & Welfare*, 497 F.2d 837, 840 (3d Cir. 1974).

Here, despite Sudler's diagnosis of idiopathic cardiomyopathy shortly before the hearing, the ALJ did not request updated reports from the appointed medical consultants. Although "there is no requirement that an ALJ must always receive an updated report from the State medical experts whenever new medical evidence is available," an ALJ "is required to obtain an updated report whenever 'additional medical evidence is received that in the opinion of the administrative law judge . . . may change the State agency medical . . . consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing of Impairments.'" *Wilson v. Astrue*, 331 F. App'x 917, 919 (3d Cir. 2009) (quoting SSR 96-6p, 1996 WL 374180, at *4).

The Commissioner contends that the ALJ concluded that the new evidence of Sudler's heart condition would not have changed the medical experts' opinions. (*See* D.I. 15 at 15-16) The Court disagrees. The ALJ's opinion does not expressly address whether it is necessary to request updated reports on the basis of Sudler's newly-diagnosed heart condition. The ALJ nowhere concludes that the new evidence could not change the opinion of the consulting experts or that no reasonable expert could conclude that Sudler's impairments, when considered in light of the new evidence, are equivalent to listed impairments. *See Simon v. Astrue*, 2010 WL 4269607, at *3 (E.D. Pa. Oct. 28, 2010). The lack of clarity about the ALJ's findings on this point alone may be sufficient reason to remand for further proceedings. *See Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981). New evidence only sometimes requires updated expert opinions, and without some explanation of the ALJ's view on the matter, the Court's review of the

21

decision is difficult.

Further, to the extent that the ALJ did address the impact of the new diagnosis on the medical consultants' reports, that analysis suggests that the ALJ believed that the new evidence may change their opinions. The ALJ gave "only limited weight" to several opinions about Sudler's physical limitations, explaining that "they d[id] not reflect the claimants's more recent cardiac condition." (Tr. at 41) That is, the ALJ implicitly acknowledged that these opinions *may* have changed due to the new heart condition, thus indicating that in the circumstances here, it is necessary to further develop the record.

Finally, despite the Commissioner's protestations to the contrary, this is not a case that is so clear that a remand is unnecessary. The testing Sudler supplied at the time of his hearing suggests that his ejection fraction measurements were approximately in the range of listing 4.02, which requires "left ventricular end diastolic dimensions greater than 6.0 cm or ejection fraction of 30 percent or less." 20 C.F.R. Part 404, Subpart P, Appendix 1, 4.02. Sudler's May 2014 testing indicated that the ejection fraction was 30% (*see id.* at 748), and subsequent testing in June 2014 also showed an estimated ejection fraction of 30% (*see id.* at 745). Additionally, the only evidence of record, although discounted as discussed above, states that Sudler's heart condition is expected to persist for more than 12 months. (*See id.* at 740) Taken together, these tests and Dr. Grewal's opinion suggest that there is a reasonable question regarding the severity and expected persistence of Sudler's heart condition for a consultant to address. *Cf. Cordovi v. Barnhart*, 2005 WL 3441222, at *3 (E.D. Pa. Dec. 14, 2005).

Accordingly, the Court determines that a remand to the ALJ for further proceedings is warranted. Given that some time has now passed since Sudler was diagnosed with heart disease,

the ALJ may also find it appropriate to take additional evidence from his treating cardiologist.
*See Cotter*, 642 F.2d at 707.

## V.     CONCLUSION

For the foregoing reasons, the Court will grant in part and deny in part the motions for
summary judgment and remand for further proceedings consistent with this opinion. An
appropriate Order follows.

23